JESSE S. FINLAYSON, SBN 179443
jfinlayson@fwtrl.com
JARED M. TOFFER, SBN 223139
jtoffer@fwtrl.com
FINLAYSON WILLIAMS TOFFER
ROOSEVELT & LILLY LLP
15615 Alton Parkway, Suite 250
Irvine, CA 92618
Telephone: (949) 759-3810 / Facsimile: (949) 759-3812

General Counsel for
Leslie T. Gladstone, Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | CASE NO. 10-02677-PB11 |
| BRIARWOOD CAPITAL, LLC, | Chapter 11 |
| Debtor. | **MOTION BY CHAPTER 11 TRUSTEE FOR ORDER:** |

**(A)  APPROVING SALE OF ESTATE ASSETS AND COMPROMISE OF CONTROVERSY PURSUANT TO 11 U.S.C. § 363 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019(a); AND**

**(B)  *NUNC PRO TUNC* RETENTION OF GORDON & HOLMES AS SPECIAL LITIGATION COUNSEL PURSUANT TO 11 U.S.C. § 327 AND FEDERAL RULES BANKRUPTCY PROCEDURE 2002 AND 2014;**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**[Notice of Motion and Declarations of Leslie T. Gladstone and Rhonda J. Holmes filed concurrently herewith]**

**Hearing:**
Date:    June 2, 2011
Time:    2:30 p.m.
Place:   Dept. 4
         Jacob Weinberger U.S. Courthouse
         325 "F" Street
         San Diego, CA 92101
Judge:   Hon. Peter W. Bowie

1  TO THE HONORABLE PETER W. BOWIE, UNITED STATES BANKRUPTCY JUDGE:

2         Leslie T. Gladstone (the "Briarwood Trustee"), the chapter 11 trustee for the bankruptcy

3  estate of Briarwood Capital, LLC ("Briarwood"), hereby moves this Court for an order:

4  (a) approving the asset sale and compromise of controversy embodied in the Settlement Agreement

5  dated April 29, 2011 (the "Settlement Agreement") between the Briarwood Trustee, Lennar

6  Corporation, Lennar Homes of California, Inc. (collectively with Lennar Corporation and present and

7  former affiliates, "Lennar"), KBR Group, LLC (collectively with its affiliates, including KBR

8  Opportunity Fund I, LP and KBR Opportunity Fund II, LP, "KBR"), KRMW Real Estate Investment

9  Group, LLC ("KRMW"), and City National Bank, N.A. ("CNB"), including the Gordon & Holmes

10  Settlement and Release Agreement (the "Gordon & Holmes Agreement") between the Briarwood

11  Trustee, Lennar, KBR, KRMW, CNB, and Gordon & Holmes, Frederic Gordon, and Rhonda

12  Holmes, pursuant to 11 U.S.C. § 363 and Federal Rules of Bankruptcy Procedure 6004 and 9019(a);

13  and (b) approving Gordon & Holmes' employment, *nunc pro tunc* to July 30, 2010, pursuant to 11

14  U.S.C. § 327 and Federal Rules of Bankruptcy Procedure 2002 and 2014.

15         A copy of the Settlement Agreement is attached as Exhibit A to the Declaration of Leslie T.

16  Gladstone (the "Gladstone Declaration") filed herewith and incorporated by this reference as if set

17  forth in its entirety herein.  This Motion is made on the grounds that the proposed settlement is fair

18  and equitable and approval of the Settlement Agreement is in the best interests of the Briarwood

19  bankruptcy estate and its creditors.

20         The Motion is based on the attached Memorandum of Points and Authorities, the Notice of

21  Motion, the Gladstone Declaration, the Declaration of Rhonda J. Holmes, all papers and records in

22  the Debtor's bankruptcy case, all matters of which this Court may take judicial notice and such

23  further evidence and argument that may be presented to the Court at or before any hearing on the

24  Motion.

25  DATED: May 3, 2011                    FINLAYSON WILLIAMS TOFFER
                                          ROOSEVELT & LILLY LLP
26

27                                        By:_____
                                                       Jared M. Toffer
28
                                          General Counsel for
                                          Leslie T. Gladstone, Chapter 11 Trustee

# TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................... 1

II.   JURISDICTION AND VENUE. ............................................................. 2

III.  SUMMARY OF BACKGROUND FACTS. ........................................... 3

    A.    The Briarwood Bankruptcy Proceedings. ...................................... 3

    B.    Litigation Rights at Issue. ............................................................. 4

        1.    The Bridges Action. ........................................................... 4

        2.    The Lakes/McCrink Action. ............................................... 6

        3.    The HCC Action. ................................................................ 6

        4.    Florida Action. ................................................................... 7

        5.    Florida Action Stay Adversary Proceeding. ...................... 8

        6.    HCC Adversary Proceeding. .............................................. 8

        7.    The KBR Actions and the KBR Counterclaims................... 8

    C.    Minkow's Plea Agreement. ........................................................... 9

    D.    The Briarwood Bankruptcy Estate's Interests in HCC and Lennar Bridges. ................ 9

    E.    The Mediation and Settlement. ..................................................... 10

    F.    Terms of the Settlement Agreement. ............................................ 11

IV.   THE AGREEMENT SHOULD BE APPROVED BECAUSE THE COMPROMISE CONTAINED IN THE AGREEMENT IS FAIR AND EQUITABLE. ........................................................................................ 12

    A.    Legal Standards for Approval. ...................................................... 12

    B.    There is a Valid Business Reason for the Proposed Transaction.............................. 14

    C.    Application of the *A&C Properties* Factors................................. 16

        1.    Probability of Success on the Merits................................... 16

        2.    Difficulties in Collection.................................................... 17

        3.    Complexity and Expense of Litigation. .............................. 17

        4.    Creditors' Interests. ........................................................... 18

Page

V.    *NUNC PRO TUNC* EMPLOYMENT OF GORDON & HOLMES. ...................................... 18

VI.    CONCLUSION. .................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

### CASES

*240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 North Brand Partners, Ltd.)*,
200 B.R. 653 (B.A.P. 9th 1996) ............................................................................ 12, 15

*A&C Props.*, 784 F.2d at 1381; *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
839 F.2d 610 (9th Cir. 1988) ................................................................................. 13, 18

*Am. West Airlines, Inc. v. City of Phoenix (In re Am. West Airlines, Inc.)*,
214 B.R. 382 (Bankr. D. Az. 1997) ............................................................................. 17

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983) ................................................................................... 1, 13

*In re Abbotts Dairies of Pennsylvania, Inc.*,
788 F.2d 143 (3d Cir. 1986) ....................................................................................... 13

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ............................................................................ 14

*In re Dow Corning Corp.*,
198 B.R. 214 (Bankr. E.D. Mich. 1996) .................................................................. 1, 13

*In re Mahoney Trocki & Associates*,
54 B.R. 823 (Bankr. S.D. Cal 1985) ............................................................................ 19

*In re Stein*,
236 B.R. 34 (D. Ore. 1999) ......................................................................................... 13

*Martin v. Kane (In re A&C Props.)*,
784 F.2d 1377 (9th Cir. 1986) ..................................................................................... 13

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996) .......................................................................................... 13

*Official Unsecured Creditors' Comm. of Pa. Truck Lines. Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.)*,
150 B.R. 595 (E.D. Pa. 1992) ...................................................................................... 14

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) ..................................................................................................... 13

*Tindall v. Mavrode (In re Mavrode)*,
205 B.R. 716 (Bankr. D.N.J. 1997) ............................................................................. 13

Page(s)

### STATUTES

11 U.S.C. § 327(e) ....................................................................................................... 18, 20

11 U.S.C. § 363(b) ....................................................................................................... 12, 15

11 U.S.C. § 363(m) ............................................................................................................. 15

### RULES

Fed. R. Bankr. P. 6004 ......................................................................................................... 12

Fed. R. Bankr. P. 9019(a) ..................................................................................................... 13

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

The Briarwood Trustee submits the following Memorandum of Points and Authorities in support of the Motion:[1]

## I.    <u>INTRODUCTION.</u>

As this Court is aware, Lennar and Briarwood, along with its principal, Nicolas Marsch, III, have been engaged in a long running legal battle related to two real estate development projects known as "The Bridges at Rancho Santa Fe" and "The Lakes at Rancho Santa Fe." The litigation between Lennar and Briarwood/Marsch has spawned at least seventeen related lawsuits and adversary proceedings and one federal criminal indictment/guilty plea, cost tens of millions of dollars in legal fees (according to the most conservative estimates), and eventually forced Briarwood, Mr. Marsch, and two additional Marsch-controlled companies, Colony Properties International, LLC ("Colony I") and Colony Properties International II, LLC ("Colony II"), into bankruptcy.

"Bankruptcy courts historically have encouraged trustees to settle lawsuits to the end that the administration of the estate may be wound up promptly." *In re Dow Corning Corp.*, 198 B.R. 214, 246 (Bankr. E.D. Mich. 1996). Consistent with this goal, the Briarwood Trustee has been engaged in extensive negotiations with the major parties in this bankruptcy case over the last several months. As the result of two intensive all-day mediation sessions before The Honorable John E. Ryan (Ret.), the parties have now reached a settlement that is fair and reasonable under the circumstances and in the best interests of the Briarwood bankruptcy estate. The settlement involves the largest creditors of the bankruptcy estate and resolves numerous complex legal issues that would otherwise require years of litigation. Because of the clear policy favoring settlements in bankruptcy, a proposed settlement should be approved unless it "fall[s] below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 613 (2d Cir. 1983) (internal quotations omitted). As explained in detail below, the Settlement Agreement between the parties easily satisfies this standard.

---

[1] Capitalized terms in this Memorandum of Points and Authorities have the meaning given to them in the preceding Motion.

1

Pursuant to the proposed Settlement Agreement, Lennar has agreed to purchase the Briarwood bankruptcy estate's interests in HCC Investors, LLC and Lennar Bridges for the sum of $4 million.  In addition, the Briarwood Trustee has agreed to dismiss the litigation matters brought against Lennar with prejudice, in exchange for mutual releases.  The Briarwood Trustee believes that dismissal of the various litigation matters is in the best interests of the Briarwood bankruptcy estate and the creditors because:  (a) Lennar has agreed to withdraw with prejudice its claims against the Briarwood estate (totaling over $600 million); (b) the revelation of criminal activity relating to the Florida Action and the Bridges Action (defined below) has raised concerns about the viability and appropriateness of the various litigation matters going forward; and (c) in light of the criminal activity and plea agreement by Barry Minkow, the Briarwood Trustee is now concerned that Lennar may prevail in the Florida Action (also defined below) and obtain a substantial monetary judgment against the Briarwood estate if no global resolution is reached.  Finally, the settlement involves agreements with the Briarwood bankruptcy estate's largest secured creditors (KBR, KRMW, and CNB) to reduce their respective secured claims to general unsecured claims, as well as an agreement from Gordon & Holmes pursuant to the Gordon & Holmes Agreement to waive any claim to attorneys' fees and costs against the Briarwood and Marsch bankruptcy estates.

The Briarwood Trustee believes strongly that this settlement is in the best interests of the estate and creditors and should be approved.  Endless litigation in the misguided hope of an eventual windfall is not a realistic strategy for the Briarwood estate.  By contrast, the proposed agreement provides a just resolution to years of contentious and mutually destructive litigation, drastically reduces the claims against the Briarwood estate, and provides the means for a meaningful distribution to unsecured creditors in a case that would otherwise be hopelessly administratively insolvent.  For these reasons, the Settlement Agreement (including the Gordon & Holmes Agreement) should be approved.

## II.    <u>JURISDICTION AND VENUE</u>.

This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicate for the relief sought is Bankruptcy Rules 2002, 2014, 6004 and 9019(a).

## III.    SUMMARY OF BACKGROUND FACTS.

The Motion is based on the following facts:

### A.    The Briarwood Bankruptcy Proceedings.

On February 23, 2010, Briarwood filed its voluntary petition under chapter 11 of the Bankruptcy Code.  Two days later, Nicolas Marsch, III, Briarwood's principal, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

On June 13, 2010, this Court granted the United States Trustee's Application to appoint Terrance J. Bruggeman as the chapter 11 examiner in the Briarwood bankruptcy case to review, analyze, and assess the operations of HCC Investors, LLC ("HCC"), a limited liability company in which Briarwood and Lennar are currently 50/50 members.  Gladstone Decl., Ex. B (Docket No. 161).

On July 8, 2010, Mr. Bruggeman issued a report in which he concluded that Mr. Marsch's conduct with respect to HCC rose "to the level of a failure to faithfully exercise his duties as a member of the HCC Executive Committee."  Gladstone Decl., Ex. C at 13 (Docket No. 183).  Mr. Bruggeman recommended that "Marsch be removed from the HCC Executive Committee and that a knowledgeable and disinterested individual be appointed to replace Marsch."  *Id.* at 14.

Approximately two weeks later, on July 19, 2010, the Court entered an order directing the appointment of a chapter 11 trustee in the Marsch and Briarwood bankruptcy cases.  The Court determined that there were two independent bases for the appointment of a trustee: (i) cause under Bankruptcy Code § 1104(a)(1) and (ii) the best interests of the creditors and the estate under Bankruptcy Code § 1104(a)(2).  More specifically, this Court stated it was "tremendously concerned" with testimony given by Mr. Marsch at his creditors' meeting and explained in its order appointing the chapter 11 trustees:

> [T]he issue squarely presented to the Court is Marsch's dishonest testimony, under oath, at the Briarwood 341(a) meeting.  This Court has lost confidence in Marsch's capacity for candor and honesty, and concludes that a trustee should be appointed in both the Marsch and Briarwood Chapter 11 cases, both for cause under 1104(a)(1), and in the best interests of creditors and the estate under § 1104(a)(2).

Gladstone Decl., Ex. D at 9 (Docket No. 209).

3

On July 30, 2010, the United States Trustee appointed Ms. Gladstone as the chapter 11 trustee in the Briarwood case and on August 6, 2010 the Court approved Ms. Gladstone's appointment. Since then, Ms. Gladstone has been serving as the chapter 11 trustee for the Briarwood bankruptcy estate.

### B.      Litigation Rights at Issue.[2]

Prior to bankruptcy, Briarwood's primary business was land acquisition and organizing financing for real estate development.  The primary developments of Briarwood related to two projects:  "The Bridges at Rancho Santa Fe" and "The Lakes in Rancho Santa Fe."  Extensive litigation between Briarwood, its principal, Mr. Marsch, and Lennar arose prepetition concerning both projects.   The two largest litigation matters are currently pending in the Superior Court for the County of San Diego, Case No. GIC877446 (the "Bridges Action") and Case No. GIC875457 (the "Lakes/McCrink Action").  Those litigation matters and other interests that are the subject of the Settlement Agreement are described briefly below:

### 1.      The Bridges Action.

Briarwood filed the Bridges Action against Lennar in San Diego Superior Court in December 2006, alleging, among other things, that Lennar improperly accounted for and mismanaged The Bridges development.  Briarwood filed the action on its own behalf and derivatively on behalf of HCC.  Gladstone Decl., Ex. E (Operative Complaint in *Briarwood Capital, LLC v. HCC Investors LLC, et al.*, Case No. GIC-877446.)[3]

Lennar filed a cross-complaint against Mr. Marsch and his entities, Briarwood and non-debtor Colony Properties LLC, for breaching their agreements with Lennar and diverting assets from HCC. Among other claims, Lennar sought the principal and interest on two $2 million loans that HCC had made to Mr. Marsch's entities in 1999 and 2003.  It also requested the rescission of two tolling agreements and an agreement that purported to admit Mr. Marsch as a member of Lennar Bridges, on

---

[2]  The Briarwood Trustee understands that Lennar will be submitting a brief in support of this Motion that provides additional detail and background on the various litigation matters.

[3]  KBR has asserted that the interests in HCC held by Briarwood, as well as all claims against Lennar held by Briarwood and Mr. Marsch, were transferred in November 2008 to KRMW.

the grounds that they were procured by fraud.  *Id.*, Ex. F (Operative Cross-Complaint in *Briarwood Capital, LLC v. HCC Investors LLC*, et al., Case No. GIC-877446.)

Two months before trial, on April 30, 2009, Lennar filed a motion seeking a bifurcation of the trial into legal and equitable causes of action pursuant to section 598 of the California Code of Civil Procedure.  The Court ruled that the trial would be conducted in four phases, with the equitable causes of action tried first and reserving for future phases any causes of action not foreclosed by the findings in that initial phase.

The Bridges trial commenced on June 23, 2009 and lasted for 11 months.  Twenty-one percipient witnesses and seven experts presented testimony and were examined.  Mr. Marsch's examination spanned 23 days.  On July 16, 2010, Superior Court Judge William R. Nevitt, Jr. issued his tentative decision which was revised into a final Statement of Decision dated September 30, 2010. *Id.*, Ex. G (Statement of Decision.)  The 52-page decision includes 303 findings of fact.  Judge Nevitt ruled against Briarwood on its claims against Lennar, rejecting Briarwood's contentions that Lennar's accounting was incorrect or that Lennar mismanaged the project.  The trial court also held that (a) Briarwood lacked standing to bring certain claims; (b) the statutes of limitation had expired on others; and (c) Briarwood and Mr. Marsch had waived and were estopped from bringing other claims. *Id.*, Ex. G at 41–47.

In addition, Judge Nevitt made findings that Mr. Marsch was "not credible," had been "thoroughly impeached with his own testimony, documents and the testimony of other witnesses," and "repeatedly gave false testimony on material issues." *Id.*, Ex. G at 12, 15–17, 20–23, 26–30, 34, 36, 38.  Judge Nevitt also found in Lennar's favor on various cross-claims and ruled that the Debtors were jointly and severally liable to Lennar for more than $17.5 million, including nearly $7 million for principal and interest on two loans the Debtors never repaid, over $7 million for "tax distributions" the Debtors received from HCC but did "not use[] to pay taxes," and over $3 million for a judgment plus interest that HCC paid on the Debtors' behalf. *Id.*, Ex. G at 47-48.  On January 14, 2011 the Superior Court entered judgment in favor of Lennar.  On February 15, 2011, Lennar filed a motion seeking to recover $36.4 million in attorneys' fees pursuant to contract.  On February 28, 2011, Briarwood initiated an appeal.  On March 30, 2011, Lennar was awarded

1    approximately $36.4 million in attorneys' fees, leaving Lennar with a liquidated claim of

2    approximately $54 million.

3        2.  **The Lakes/McCrink Action.**

4       In 2006, Briarwood sued Lennar claiming that an oral partnership agreement had existed

5    between Lennar and Briarwood to acquire and develop a 542-acre master-planned community near

6    the Bridges known as McCrink Ranch.  The case was dismissed on the eve of trial when Mr. Marsch

7    testified that the alleged oral agreement was not to form a new joint venture, but to use the existing

8    HCC venture to acquire and develop McCrink Ranch under the name The Lakes at Rancho Santa Fe.

9    Based on Mr. Marsch's testimony, Lennar moved for judgment on the pleadings.  The trial court

10   granted the motion.  Late last year, the Court of Appeal reversed the dismissal, concluding that Mr.

11   Marsch's testimony could not be adjudicated by way of a motion for judgment on the pleadings.  *Id.*,

12   Ex. H.

13      If the Lakes/McCrink Action does not settle, the Briarwood Trustee understands that Lennar

14   anticipates filing other dispositive motions and that Lennar believes strongly that it will ultimately

15   prevail on those motions.  Moreover, if the case is tried, in light of Mr. Marsch's testimony tying the

16   alleged oral agreement to HCC, any claim would arguably have to be brought derivatively on behalf

17   of HCC, not individually on behalf of Briarwood.  Thus, if the Court's decision in the Bridges Action

18   stands, that would mean that any recovery in the Lakes/McCrink Action would arguably belong to

19   HCC, not Briarwood.  Because Judge Nevitt found in the Bridges Action that the operative

20   agreements require distribution of proceeds first to Lennar for its invested capital and preferred

21   return, an amount that currently approximates $300 million, it is quite possible that Briarwood would

22   never recover even if it prevailed.  *Id.*, Ex. G at Fact No. 44 at 17.

23       3.  **The HCC Action.**

24      Briarwood filed this action in an effort to obtain fees that it asserted were owed to it by HCC

25   pursuant to the HCC Operating Agreement for periods beginning on January 1, 2009.  *Id.*, Ex. I

26   (Complaint in *Briarwood Capital, LLC v. HCC Investors LLC*, Case No. 37-2009-00097749-CU-BC-

27   CTL).  The parties stipulated to stay the HCC Action pending the outcome of the Bridges Action

28   because it involved Briarwood's claim to the same fees for the period before January 1, 2009.

At the conclusion of the Bridges Action, the trial court ruled that Briarwood was not entitled to override, developer, or transfer fees and adjudicated Briarwood's entitlement to fees going forward. *Id.*, Ex. G at 33 ("Commencing no later than June 2008, HCC has no obligation to pay Section 6.05(a) developer fees to Briarwood or Mr. Marsch because Mr. Marsch has taken actions, including the deception addressed herein, that render him unable to provide such services ... HCC's decision, commencing in June 2008, to stop paying fees to Briarwood, Mr. Marsch and Lennar was a reasonable business judgment and fair to HCC."). The Bridges court's findings and conclusions may have preclusive *res judicata* effect.

### 4.    Florida Action.

In July 2008, Mr. Marsch wrote a letter to each of Lennar Corporation's outside directors accusing Lennar of stealing $37.5 million from him and threatening to expose Lennar's "dirty little secrets" to the SEC unless it paid millions of dollars. Lennar refused to pay and instead filed suit against Mr. Marsch and Briarwood in Florida state court for their actions. *Id.*, Ex. J (Lennar's 4th Amended Complaint).

On January 9, 2009, Barry Minkow (who was hired by Marsch) started an Internet campaign against Lennar. Minkow accused Lennar of committing securities fraud, failing to disclose "related party transactions," operating a "Madoff-like ponzi scheme," teetering on the brink of bankruptcy, cheating homebuyers, looting joint ventures, and giving its second-highest ranked executive a $5 million "disguised kickback." *Id.*, Ex. J. Investors traded a record 58 million shares of Lennar Corporation on January 9, 2009 and Lennar's stock dropped 20% and more than $364 million in market capitalization was lost. Lennar immediately amended its complaint in Florida to add Mr. Minkow and his company the Fraud Discovery Institute ("FDI"). In February 2010, the court set an August trial date in the Florida Action. Shortly thereafter, the Debtors filed for bankruptcy protection and obtained an order extending the automatic stay to Minkow and FDI, except for a then-pending motion for terminating sanctions that Lennar had filed against them.

On December 27, 2010, the Court entered an order (a) defaulting Minkow; (b) requiring an adverse instruction against FDI be read to the jury at the upcoming trial against the other defendants; and (c) ordering Minkow and FDI to reimburse Lennar for all attorneys' fees and costs incurred in

uncovering and proving the pervasive misconduct. "After considerable reflection," the court held, "Minkow's misconduct was so egregious and pervasive, including efforts at cover up his misconduct, there is no remedy short of default that could restore Lennar and protect the integrity of the judicial process .... Minkow's corruption of the litigation process represents a substantial threat to orderly administration of justice. When confronted by such a threat, there is no choice but to take decisive action to fully protect the institution of justice, its processes and its litigants from future abuse. . . ." *Id.*, Ex. K.

Lennar has informed the Trustee that absent a settlement, Lennar will prosecute the case against the Debtors to judgment after it obtains relief from the automatic stay. Lennar claims that the damage to its reputation and operations will result in an award against both the Briarwood and Marsch estates in excess of $500 million.

### 5.    Florida Action Stay Adversary Proceeding.

On February 28, 2010, Briarwood filed in the Bankruptcy Court an adversary proceeding entitled *Briarwood Capital, LLC v. Lennar Corporation and Lennar Homes of California, Inc.*, (Adv. Pro. No. 10-90118-PB (the "Florida Action Stay Adversary Proceeding"). This matter is presently pending before the Bankruptcy Court.

### 6.    HCC Adversary Proceeding.

On April 5, 2010, Briarwood filed an adversary proceeding in the Bankruptcy Court entitled *Briarwood Capital, LLC v. HCC Investors LLC*, (Adv. Pro. No. 10-90184-PB) (the "HCC Adversary Proceeding"). This matter is presently pending before the Bankruptcy Court.

### 7.    The KBR Actions and the KBR Counterclaims.

Prior to the Petition Dates, Briarwood filed three lawsuits against KBR or KBR's management, among others, in San Diego Superior Court seeking to prevent KBR from exercising remedies under its various agreements with the Debtors: (i) *Briarwood Capital, LLC, et al. v. KBR Group, LLC, et al.*, Case No. 37-2009-00090247-CU-BC-CTL (which was dismissed without prejudice), (ii) *Briarwood Capital, LLC, et al. v. KBR Group, LLC, et al.*, Case No. 37-2009-00090462-CU-BC-CTL (which is stayed), and (iii) *Briarwood Capital, LLC et al. v. KBR Group, LLC, et al.*, Case No. 37-00100835 (which was dismissed without prejudice) (collectively, the "KBR

8

Actions").  KBR filed five adversary proceedings in the Bankruptcy Court.  Four of the adversary proceedings (Adv. Pro. Nos. 10-90132-PB11, 10-90133-PB11, 10-90134-PB11 and 10-90135-PB11) sought declaratory relief that KBR had properly taken control of Briarwood, KRMW, Colony I and Colony II and injunctive relief enjoining Marsch from exercising control over those entities.  The fifth adversary proceeding (Adv. Pro. No. 10-90322-PB11) sought declaratory relief regarding the ownership of proceeds of the litigation against Lennar, the ownership of the membership interest in HCC, the ownership interest in Lennar Bridges and KBR's rights under the operating agreement of KRMW.  (Adv. Pro. Nos. 10-90132-PB11, 10-90133-PB11, 10-90134-PB11, 10-90135-PB11 and 10-90322-PB11 are collectively referred to herein as the "KBR Adversary Proceedings".)  The Briarwood bankruptcy estate, Marsch bankruptcy estate, Colony I bankruptcy estate and Colony II bankruptcy estate jointly filed counter-claims to and in the KBR Adversary Proceedings (collectively, the "KBR Counterclaims").

### C.    Minkow's Plea Agreement.

On March 22, 2011, Barry Minkow pled guilty to one count of conspiracy to commit securities fraud with respect to his conduct relating to the Florida Action.  *Id.*, Ex. L.  The plea agreement states that Minkow conspired with Conspirator A "and others ... to execute a scheme and artifice to defraud Lennar Corporation and others in connection with securities issued by Lennar Corporation and to obtain, by means of false or fraudulent pretenses, representations, or promises, money or property from Lennar Corporation in connection with the purchase or sale of securities issued by Lennar Corporation ….  When Conspirator A was unsuccessful at obtaining a judgment in a court of law, Conspirator A decided to employ extortionate means to induce Lennar Corporation to pay the demanded sum of money."  *Id.*, Ex. L at 9.  "Conspirator A" in the plea agreement has been identified by Mr. Minkow's lawyer as Nicolas Marsch III.

### D.    The Briarwood Bankruptcy Estate's Interests in HCC and Lennar Bridges.

HCC Investors, LLC was formed in August 1997 to develop and manage The Bridges, a real estate project located in North San Diego County.  Lennar holds a 50% membership interest in HCC

and the Briarwood bankruptcy estate contends that it owns the other 50% membership interest in HCC.

Lennar Bridges, LLC was formed in November 1998 to acquire and develop a parcel of real property known as Santa Fe Creek located adjacent to the property that became The Bridges. Briarwood and Marsch claimed during the Bridges Action that Briarwood either was or should be equitably deemed a member of Lennar Bridges.    That argument was rejected by Judge Nevitt.

**E.    The Mediation and Settlement.**

To facilitate a mediation, and in light of the numerous litigation matters and the complexity of the issues involved, the Briarwood Trustee decided to meet separately with litigation counsel for the Debtors and Lennar to listen to presentations regarding their belief as to the value of the various litigation rights.  Gladstone Decl., ¶¶ 15-17.  Following those meetings the Briarwood Trustee agreed to participate in a mediation session in an effort to reach a global resolution that would result in a meaningful distribution to creditors.  *Id*.  To that end, on March 2, 2011, the Briarwood Trustee and her counsel, the Trustee for the Marsch estate and his counsel, Mr. Marsch and his counsel, Gordon & Holmes, and Lennar and its counsel attended a day-long mediation session in San Diego before Judge Ryan.  *Id*.  In addition to those in attendance, Lennar and the Briarwood Trustee had access to and were in communication with several of the Briarwood bankruptcy estate's largest creditors, including CNB and KBR.  Each of the attendees at the mediation session, including Mr. Marsch and his counsel, were given an opportunity to voice their respective positions to Judge Ryan with respect to any potential settlement.  *Id*.  Although the parties mediated in good faith throughout the day, they were unable to reach a resolution at that time.  *Id*.

On March 22, 2011, shortly after the initial mediation session, Mr. Minkow pled guilty and the Information and press releases identifying Mr. Marsch as "Conspirator A" were released.  *Id*.  On March 29, 2011, Lennar and its counsel, the Briarwood Trustee and her counsel, KBR and its counsel, and CNB and its counsel attended an additional mediation session before Judge Ryan.  *Id*.  At that mediation session, the Briarwood Trustee, the Briarwood bankruptcy estates' three largest creditors (Lennar, KBR/KRMW and CNB) and Gordon & Holmes were able to reach a global resolution that will result in a meaningful distribution to creditors.  *Id*.

10

In short, the Settlement Agreement requires Lennar to pay the Briarwood Trustee a total of $4 million for the Briarwood bankruptcy estate's 50% interest in HCC and the interest in Lennar Bridges that Briarwood asserted it owned in the Bridges Action.  In light of the posture of the various litigation matters (including substantial judgments against Briarwood), the criminal plea by Mr. Minkow and the implication of Mr. Marsch in the criminal activity, the Briarwood Trustee believes it is in the best interests of the estate and the creditors to dismiss the various litigation matters in exchange for releases.  *Id.* at ¶ 21.  Moreover, the Briarwood Trustee does not believe the estate or its creditors should profit from potential criminal activity.  *Id.*  A summary of the terms of the Settlement Agreement is provided below.

**F.    Terms of the Settlement Agreement.**

The material terms of the Settlement Agreement are as follows:[4]

- The Agreement is subject to and only effective upon Bankruptcy Court approval. If the Agreement does not become effective within seventy-five (75) days of the Agreement Date, any Party may elect to terminate its obligations under the Agreement.

- Lennar will pay a total of $4,000,000 to the Briarwood Trustee in exchange for any and all interests in HCC held by the Briarwood Estate and any and all interests in Lennar Bridges held by the Briarwood Estate.  Within five (5) business days after the Agreement date, Lennar will pay the Briarwood Trustee five-hundred thousand dollars ($500,000), which payment shall be non-refundable.  Lennar will pay the Briarwood Trustee the remaining three million five-hundred thousand dollars ($3,500,000.00) on the Effective Date.

- The Briarwood Trustee will deliver to Lennar requests or stipulations for dismissals with prejudice of: (i) Briarwood's appeal of the Bridges Action, (ii) the Lakes/McCrink Action, (iii) the HCC action, (iv) the Florida Action Stay Adversary Proceeding, and (v) the HCC Adversary Proceeding.

- The Briarwood Trustee will deliver to KBR requests or stipulations for dismissals with prejudice of: (1) the KBR Actions and (ii) the KBR Adversary Counterclaims.

- The Briarwood Trustee agrees to accept as final the Bridges Final Judgment and the Bridges Fee Award, provided, however, that Lennar will withdraw all proofs of claim against Briarwood and agree not to take any distribution from the Briarwood Estate.

---

[4]    In the event of a discrepancy between the summary of the terms of the Settlement Agreement set forth herein and the Settlement Agreement itself, the Settlement Agreement controls.

- The Briarwood Trustee shall cause to be released and re-conveyed to Colony I and Colony II the leases between First Place Equity, LLC and Colony I or Colony II without further payment.

- CNB agrees to release any liens on the assets of the Briarwood Estate and will have an allowed, general unsecured claim in the amount of $7,020,810.12.

- KBR and KRMW agree to release any liens or ownership claims on the assets of the Briarwood Estate and will have an allowed, general unsecured claim in the amount of $3,000,000.

- Colony I shall have an allowed, general unsecured claim in the amount of $57,248.62.  Colony II shall have an allowed, general unsecured claim in the amount of $54,705.44.

- Lennar, KBR/KRMW, CNB and the Briarwood Trustee will execute mutual releases of all claims, with limited exceptions.

- The Briarwood Trustee will seek to retain Gordon & Holmes as special litigation counsel pursuant to 11 U.S.C. § 327 and Federal Rules of Bankruptcy Procedure 2002 and 2014, *nunc pro tunc* to July 30, 2010.  This agreement was made on the express condition that Gordon & Holmes will waive any and all claims for fees, costs or expenses for providing services to the Briarwood and Marsch bankruptcy estates under its Contingency Fee Agreement.

Gladstone Decl., Ex. A.

## IV.    THE AGREEMENT SHOULD BE APPROVED BECAUSE THE COMPROMISE CONTAINED IN THE AGREEMENT IS FAIR AND EQUITABLE.

### A.    Legal Standards for Approval.

"The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The sale of bankruptcy assets can either be public (which means that an auction is conducted and the assets are sold to the highest bidder) or private (which means that the debtor enters into an agreement to sell the assets of the bankruptcy estate, which is then presented to the Bankruptcy Court for approval without the opportunity for overbidding).  Fed. R. Bankr. P. 6004.  Here, the Trustee is proposing a "private" sale.  Generally, the proposed sale of an asset of the estate should be approved if there is a valid business justification for the sale. *240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 North Brand Partners, Ltd.)*, 200 B.R. 653, 659 (B.A.P. 9th 1996) (holding that debtors must demonstrate "valid business justification" and "good faith" for sale of assets); *In re Abbotts Dairies of*

12

1  *Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (setting forth the "sound business purpose" test for

2  approving the sale of substantially all of the debtor's assets).

3          In addition, Bankruptcy Rule 9019(a) permits a trustee to compromise and settle claims by

4  and against the bankruptcy estate, subject to bankruptcy court approval.  Fed. R. Bankr. P. 9019(a).

5  "Settlements are generally favored in bankruptcy proceedings, in that they provide for an often

6  needed and efficient resolution of the bankruptcy case."  *Tindall v. Mavrode (In re Mavrode)***,** 205

7  B.R. 716, 719 (Bankr. D.N.J. 1997); *see also In re Stein*, 236 B.R. 34, 37 (D. Ore. 1999) ("Pursuant

8  to Bankruptcy Rule 9019(a), compromises are favored in bankruptcy ...."); *In re Dow Corning Corp.*,

9  198 B.R. at 246 ("Bankruptcy courts historically have encouraged trustees to settle lawsuits to the

10  end that the administration of the estate may be wound up promptly.").

11          "Compromises are a normal part of the process of reorganization."  *Protective Comm. for*

12  *Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (quotations

13  omitted).  "Indeed, it is an unusual case in which there is not some litigation that is settled between

14  the representative of the estate and an adverse party."  *Myers v. Martin (In re Martin)*, 91 F.3d 389,

15  393 (3d Cir. 1996).  Guided by these principles, the Supreme Court has held that, compromises and

16  settlements in bankruptcy should be approved if they are "fair and equitable."  *Anderson*, 390 U.S. at

17  424; *see also Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).

18          According to the Ninth Circuit, a court should consider the following factors in considering

19  whether a proposed settlement is fair and equitable:

20          (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in
        the matter of collection; (c) the complexity of the litigation involved, and the expense,
21      inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors
        and a proper deference to their reasonable views in the premises.
22

23  *A&C Props.*, 784 F.2d at 1381; *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610,

24  620 (9th Cir. 1988).

25          The Bankruptcy Court is not required to conduct a "mini-trial" to decide the numerous

26  questions of law and fact raised by the litigation that is the subject of a Bankruptcy Rule 9019

27  motion.  Instead, the Bankruptcy Court's responsibility is only to "canvass" the relevant issues.

28  *Cosoff*, 699 F.2d at 613.  The Court does not have to be convinced that the settlement is the best

13

1   possible compromise, only that the settlement falls within a reasonable range of litigation

2   possibilities.  *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004) (finding that

3   the proper test to apply in the determination of whether to approve a proposed compromise is if the

4   compromise falls "within the reasonable range of litigation possibilities").  Therefore, the settlement

5   need only be above "the lowest point in the range of reasonableness."  *Id.* (citing *Official Unsecured*

6   *Creditors' Comm. of Pa. Truck Lines. Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.)*, 150

7   B.R. 595, 598 (E.D. Pa. 1992)).

8           As explained below, application of the *A&C Properties* factors shows that the compromise

9   contained in the Agreement is fair and equitable and should be approved.

10          **B.       There is a Valid Business Reason for the Proposed Transaction.**

11          The Briarwood Trustee proposes to sell any and all interests the Briarwood bankruptcy estate

12   has in HCC and Lennar Bridges.  Gladstone Decl., ¶ 18.  The purpose of the proposed sale is to

13   facilitate a global settlement of claims with Lennar and the Briarwood bankruptcy estate's largest

14   creditors and to liquidate any interest the estate has in HCC and Lennar Bridges.  *Id.*  Notably, there

15   remains a dispute as to whether the Briarwood estate even owns any interests in HCC and/or Lennar

16   Bridges (as opposed to KRMW).  *Id.*  Thus, the proposed sale, which includes with it a release by

17   KRMW of any claims to the Briarwood bankruptcy estate's interest in HCC and Lennar Bridges, is a

18   significant benefit to the estate and its creditors as it eliminates any uncertainty regarding the

19   ownership interests.  *Id.*  Moreover, the Briarwood estate's largest creditors – Lennar, KBR/KRMW,

20   CNB and Gordon & Holmes – have all agreed to the sale of the assets to Lennar.  *Id.*, ¶ 19.

21          In addition, the Briarwood Trustee believes that a payment of $4 million for the estate's

22   interests in HCC and Lennar Bridges constitutes fair value for the assets and will allow for a

23   meaningful distribution to creditors.  *Id.*, ¶¶ 18-19.  Based on Judge Nevitt's ruling in the Bridges

24   Action, the current economic value of the Briarwood estate's interest in HCC and Lennar Bridges

25   (absent a reversal on appeal) is questionable if not negligible.  *Id.*  In light of those factors, and

26   because this proposed global settlement will result in a meaningful distribution to creditors sooner

27   rather than later, the Briarwood Trustee believes that there are "valid business purposes" for the

28

proposed sale and that the Agreement should therefore be approved under 11 U.S.C. § 363(b)(1). *See generally 240 North Brand Partners*, 200 B.R. at 659.

Here, the Briarwood Trustee is proposing a "private" sale for several reasons. First, there is no indication that any other creditor or third-party would desire to outbid Lennar's offer to purchase the estate's interests in HCC and Lennar Bridges for $4 million. *Id.*, ¶ 19. Indeed, the one creditor who may have a strong interest in purchasing those assets for a significant sum – KBR – has already agreed to let Lennar purchase the assets. *Id.* Second, the interests in HCC and Lennar Bridges involve the rights to operate and manage real estate in which Lennar already holds significant ownership interests. *Id.* Lennar is currently the managing member of HCC and claims it is the sole owner of Lennar Bridges. *Id.* As a result, Lennar is the only logical bidder for these interests. *Id.* Third, the Briarwood Trustee believes that a private sale is not only appropriate in light of the interests being sold, but will also result in facilitating a prompt resolution to this matter, ensuring that creditors receive a meaningful distribution as soon as possible and without unnecessary delays. *Id.* Finally, the proposed private sale is part of an integrated settlement, and it would not be possible to realize the other benefits of the settlement if the estate proposed to conduct an auction. *Id.*

As a condition of the Settlement Agreement, the Briarwood Trustee also requests a finding by the Court that the sale of the Briarwood bankruptcy estate's interest in HCC and Lennar Bridges to Lennar is being consummated in good faith and that both the sale, and the releases of claims by the Briarwood Trustee and the Briarwood bankruptcy estate, will be governed by 11 U.S.C. § 363(m).[5] *Id.*, ¶ 20. In addition, the Briarwood Trustee requests that the Court order a waiver of the stay period contemplated by Federal Rule of Bankruptcy Procedure 6004(h) and any other relevant stay periods after entry of any order approving this Motion. *Id.* These finding are necessary to ensure that the business operations of HCC and Lennar Bridges are not unnecessarily disrupted by any appeal of an order approving this Motion. *Id.*

---

[5] Section 363(m) provides in pertinent part, "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith …." 11 U.S.C. § 363(m).

15

C.      **Application of the *A&C Properties* Factors.**

1.      **Probability of Success on the Merits.**

Based on the current posture of the various litigation matters (including a likely judgment against Briarwood in excess of $54 million), the Briarwood Trustee believes that the probability of the Briarwood bankruptcy estate recovering any substantial sum of money in the future is low.  *Id.*, ¶ 21.  Perhaps more importantly, in light of the criminal conduct that recently has come to light, the Briarwood Trustee does not believe it is appropriate for the estate or the creditors to profit off of any potential wrongdoing.  *Id.*  As a result, the Briarwood Trustee believes it is not only appropriate, but in the best interests of all involved to dismiss the various litigation matters in exchange for mutual releases.  *Id.*

As support for the Briarwood Trustee's position, the following summarizes the current posture of the litigation matters and demonstrates the significant hurdles facing the Briarwood bankruptcy estate with respect to the potential for any meaningful recovery through the pursuit of further litigation:

- Mr. Marsch has been implicated as a co-conspirator with Barry Minkow with respect to criminal activity relating to the Florida Action and with respect to efforts to get Lennar to pay substantial sums of money to resolve the Bridges Action.  The implication of Mr. Marsch in criminal activity relating to the various litigation matters raises serious concerns about the viability of any of the actions going forward, particularly considering that Mr. Marsch is a key witness.

- Lennar has prevailed in the Bridges Action and Briarwood currently faces a judgment **in excess of $54 million**.  The judgment includes substantial findings of fact that call into question the credibility of Briarwood's key witness, Nicolas Marsch, and which greatly reduces the value of Briarwood's interest (if any) in HCC and Lennar Bridges.

- Even though Briarwood prevailed on the appeal in the Lakes/McCrink Action, that appeal was won on procedural grounds.  Significant questions remain as to whether Briarwood could prevail at trial, if the case gets to trial.

- The HCC Action is based largely on the findings in the Bridges Action and, absent a reversal of the Bridges Action on appeal, Lennar has prevailed.

- The plea agreement with Mr. Minkow suggests that potential damage to Lennar in the Florida Action was **approximately $583 million**.

- The actions against KBR have either already been dismissed or are stayed.

*Id.*

16

Simply put, as things currently stand, the Briarwood bankruptcy estate is facing the likelihood of liabilities to Lennar of potentially hundreds of millions of dollars – not the other way around – and, based on recent events, the Briarwood Trustee believes that the likelihood of Briarwood ultimately prevailing is low. *Id.*

### 2. Difficulties in Collection.

As discussed above, the Briarwood bankruptcy estate faces significant liabilities to Lennar. Moreover, the Briarwood bankruptcy estate is currently insolvent and would need to borrow significant money to fund the litigation going forward. *Id.*, ¶ 22. Even assuming the Briarwood Trustee had the resources to pursue the litigation, the likelihood of ever collecting any amounts from Lennar is unlikely given the current posture of the cases. *Id.* Even if, after years of additional litigation, Briarwood was to prevail on some or all of the litigation, significant questions remain as to whether KBR/KRMW owns the litigation rights against Lennar and the interests in HCC and Lennar Bridges. Moreover, in light of the revelation of the criminal activity relating to the litigation, the chances of collection are even more circumspect.

In contrast, the Briarwood bankruptcy estate should have no problem whatsoever collecting on the payments due under the Settlement Agreement. *Id.* Lennar has agreed to pay $500,000 upfront and, from all accounts, has the funds to pay the remaining $3,500,000 upon approval of the settlement. As such, because there should be no difficulty in collecting under the Settlement Agreement, this factor favors approval of the Settlement. *See Am. West Airlines, Inc. v. City of Phoenix (In re Am. West Airlines, Inc.)*, 214 B.R. 382, 386 (Bankr. D. Az. 1997).

### 3. Complexity and Expense of Litigation.

As explained above, one of the best aspects of the proposed settlement is that it resolves all of the Briarwood bankruptcy estate's various disputes with Lennar, KBR/KRMW, CNB and Gordon & Holmes in one fell swoop. Gladstone Decl., ¶ 23. These disputes involve immensely complex issues of law and fact. *Id.* The cost savings in avoiding long and arduous litigation among the Parties is immeasurable. *Id.* If the proposed settlement is not approved, in contrast, the Briarwood bankruptcy estate would, in all likelihood, be mired in litigation over these issues for years. *Id.* However, all of these disputes are resolved by the Settlement Agreement, in a way that it is fair and reasonable under

17

the circumstances.  Because of the Settlement Agreement, the Briarwood Trustee will be able to preserve these resources for the benefit of its estate and creditors, rather than expending them on funding drawn-out and uncertain litigation.  *Id.*

### 4. Creditors' Interests.

As noted, the Ninth Circuit has held that, when considering a proposed settlement under Bankruptcy Rule 9019, the interests of creditors are "paramount."  *Woodson*, 839 F.2d at 620.  In this matter, the proposed settlement will materially benefit creditors in several respects.  First and foremost, the cash payments under the Settlement Agreement, combined with the fact that the Settlement Agreement resolves any claims by Lennar, KBR/KRMW, CNB and Gordon & Holmes, provide necessary funds for the administration of the Briarwood bankruptcy estate and to provide a meaningful distribution to unsecured creditors.  Second, the fact that the Settlement Agreement will obviate the need for the Briarwood Trustee to borrow additional monies to fund drawn-out and expensive litigation, likely for years, is a significant benefit to the creditors.  The Settlement Agreement will help ensure that creditors receive a certain distribution in the near term, instead of gambling on uncertain litigation that is likely to take years.  Finally, the Settlement Agreement resolves all disputes with the Briarwood bankruptcy estate's largest secured creditors.  KBR/KRMW and CNB have agreed to eliminate their secured claims and take an allowable unsecured claim.  In addition, Gordon & Holmes has agreed to waive its claims to attorneys' fees and costs.  The end result is that all creditors will receive a meaningful distribution in the near term.

## V. *NUNC PRO TUNC* EMPLOYMENT OF GORDON & HOLMES.

As part of the separate settlement agreement with Gordon & Holmes, the parties have agreed that the Briarwood Trustee would seek the Court's approval, through this Motion, for the retention of Gordon & Holmes to serve as special litigation counsel to the Briarwood bankruptcy estate pursuant to 11 U.S.C. § 327(e), *nunc pro tunc* to July 30, 2010, the date the Briarwood Trustee was appointed.  *Id.*, ¶ 24.  Gordon & Holmes' retention shall be in accordance with the Contingent Fee Legal Services Contract (the "Contingency Fee Agreement") dated as of October 1, 2008 by and among Gordon & Holmes, Briarwood and Marsch, a copy of which is attached as Exhibit M to the Declaration of Rhonda J. Holmes ("Holmes Decl.").  ***This agreement was made on the condition that Gordon &***

18

***Holmes will waive any and all claims for fees, costs or expenses for providing such services***

***pursuant to the Gordon & Holmes Agreement.***

The standards for approving the *nunc pro tunc* retention of a professional are set forth in *In re Mahoney Trocki & Associates*, 54 B.R. 823, 826 (Bankr. S.D. Cal 1985) as follows:

1. That there was an express employment agreement between the debtor, the trustee or creditors' committee and the professional person who performed the services;

2. That notice of the application for entry of a *nunc pro tunc* order and opportunity for objection has been provided under Bankruptcy Rule 2002;

3. That the professional presently meets and, at all times during the period of which approval of employment is sought has met the standards of 11 U.S.C. §327;

4. That the professional has made the threshold showing justifying his/her employment as required by Bankruptcy Rule 2014;

5. That the applicant exhibits no pattern of inattention or negligence in soliciting prior judicial approval of his/her employment in cases before this Court;

6. That the applicant's failure to seek pre-employment approval is satisfactorily explained;

7. That neither the estate nor any other party in interest will be actually or potentially prejudiced by entry of the *nunc pro tunc* order.

The Briarwood Trustee submits that the aforementioned standards are satisfied in this case. The Contingency Fee Agreement is attached as Exhibit M to the Holmes Declaration. This Motion is being presented on notice to all creditors and parties in interest.

The Declaration of Rhonda J. Holmes, filed concurrently herewith, provides a declaration of disinterest which satisfies the standards of section 327 of the Bankruptcy Code. Holmes Decl., ¶¶6-8.

Gordon & Holmes was previously approved to represent the debtor in connection with the Lakes/McCrink Action and Bridges Action pursuant to an order entered on June 8, 2010. *Id.*, ¶ 3. In order to avoid any confusion as to whether the appointment order extends to the Briarwood Trustee as opposed to just the debtor, the Briarwood Trustee is requesting *nunc pro tunc* approval of the retention of Gordon & Holmes in connection with the Lakes/McCrink Action and the Bridges Action. Gladstone Decl., ¶ 24. The retention of Gordon & Holmes is necessary to validate the actions taken by Gordon & Holmes on behalf of the Briarwood Trustee and the Briarwood bankruptcy estate since July 30, 2010 with respect to the Lakes/McCrink Action and the Bridges Action. *Id.* In addition,

1    while a settlement with Lennar is pending, there are deadlines that still need to be met with respect to

2    both the Lakes/McCrink Action and the Bridges Action.

3        This *nunc pro tunc* motion is necessary because the Briarwood Trustee did not previously

4    have any available funds to pay professionals and there was confusion as to the status of Gordon &

5    Holmes employment because they had previously been approved as counsel for the debtor-in-

6    possession. *Id*. Additionally, the Briarwood Trustee did not previously seek approval of Gordon &

7    Holmes' employment because the Parties were actively involved in settlement negotiations with

8    Lennar and other parties, which came to a resolution at the mediation on March 29, 2011. *Id*. As

9    part of that process, Gordon & Holmes' employment status and rights to fees and expenses were

10   resolved. *Id*. Now the Briarwood Trustee seeks an order formally approving Gordon & Holmes as

11   her counsel.

12       Neither the estate nor any party in interest will be actually or potentially prejudiced by the

13   entry of a *nunc pro tunc* order, particularly considering ***that Gordon & Holmes has agreed pursuant***

14   ***to the Gordon & Holmes Agreement to waive any claims to compensation or reimbursement of***

15   ***expenses from the Briarwood Trustee or the Briarwood bankruptcy estate.*** Holmes, Decl., ¶ 5.

16       Finally, the work performed by Gordon & Holmes to date was beneficial to the estate in that

17   it preserved the *status quo* pending resolution of the various matters through mediation. Gladstone

18   Decl., ¶ 24. Accordingly, the Briarwood Trustee hereby requests, pursuant to 11 U.S.C. § 327(e),

19   that the Court enter an order approving the employment of Gordon & Holmes, *nunc pro tunc* to July

20   30, 2010.

21   **VI.    CONCLUSION.**

22       For the foregoing reasons, the Briarwood Trustee submits that the proposed Settlement

23   Agreement is fair and equitable and in the best interests of the Briarwood bankruptcy estate and the

24   creditors. The Briarwood Trustee respectfully requests that the Court enter an order approving the

25   / / /

26   / / /

27   / / /

28   / / /

1  Settlement Agreement (including the Gordon & Holmes Agreement) and also approving the

2  employment of Gordon & Holmes, *nunc pro tunc* to July 30, 2010.

3  DATED:  May 3, 2011

4  FINLAYSON WILLIAMS TOFFER
   ROOSEVELT & LILLY LLP

5  By:_____

6                          Jared M. Toffer

7  General Counsel for
   Leslie T. Gladstone, Chapter 11 Trustee

# CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 15615 Alton Parkway, Suite 250, Irvine, California 92618, in said County and State.  On **May 3, 2011**, the document(s) entitled:

**MOTION BY CHAPTER 11 TRUSTEE FOR ORDER:  (A) APPROVING SALE OF ESTATE ASSETS AND COMPROMISE OF CONTROVERSY PURSUANT TO 11 U.S.C. § 363 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019(a); AND (B) *NUNC PRO TUNC* RETENTION OF GORDON & HOLMES AS SPECIAL LITIGATION COUNSEL PURSUANT TO 11 U.S.C. § 327 AND FEDERAL RULES BANKRUPTCY PROCEDURE 2002 AND 2014;MEMORANDUM OF POINTS AND AUTHORITIES**

was/were served as follows:

___✓___ (CM/ECF ELECTRONIC SERVICE):  The following are registered as CM/ECF Users with the Court, and have consented to service through the Court's automatic transmission of a notice of electronic filing:

- **Jess R. Bressi**    jbressi@luce.com
- **Christopher Celentino**    ccelentino@duanemorris.com
- **R. J. Coughlan**    rcoughlan@csllaw.com, gwelter@csllaw.com
- **Jonathan S. Dabbieri**    dabbieri@sullivanhill.com, hill@sullivanhill.com; vidovich@sullivanhill.com; stein@sullivanhill.com
- **Jeffry A. Davis**    jadavis@mintz.com, dsjohnson@mintz.com;jrdunn@mintz.com;aobrient@mintz.com
- **Joseph R. Dunn**    jrdunn@mintz.com, ccpearsall@mintz.com; jadavis@mintz.com; aobrient@mintz.com; dsjohnson@mintz.com
- **Martin A. Eliopulos**    elio@higgslaw.com, moklestadn@higgslaw.com
- **Jesse S. Finlayson**    jfinlayson@fwtrl.com, wmills@fwtrl.com
- **Leslie T. Gladstone**    candic@financiallawgroup.biz, candic@financiallawgroup.biz; lgladstone@ecf.epiqsystems.com; christinb@financiallawgroup.biz; sandray@financiallawgroup.biz; geraldinev@financiallawgroup.biz
- **Michael J. Gomez**    mgomez@frandzel.com, efiling@frandzel.com,sking@frandzel.com
- **Ben H. Logan**    blogan@omm.com
- **Dawn Messick**    dmessick@duanemorris.com
- **Randall P. Mroczynski**    rmroczynski@cookseylaw.com
- **Michael T. O'Halloran**    mto@debtsd.com, cs@debtsd.com;ac@debtsd.com
- **Abigail Obrient**    aobrient@mintz.com, dsjohnson@mintz.com
- **David A. Ortiz**    david.a.ortiz@usdoj.gov, USTP.REGION15@USDOJ.GOV; shannon.m.vencill@usdoj.gov; tiffany.l.carroll@usdoj.gov
- **Joseph J. Rego**    joerego@regolaw.com, rlewis@regolaw.com,lindsay@regolaw.com
- **Gary B. Rudolph**    rudolph@sullivanhill.com, hill@sullivanhill.com; vidovich@sullivanhill.com; stein@sullivanhill.com;iriarte@sullivanhill.com
- **Kenneth N. Russak**    krussak@frandzel.com, efiling@frandzel.com,ltokubo@frandzel.com
- **Susan C. Stevenson**    sstevenson@psdslaw.com
- **United States Trustee**    ustp.region15@usdoj.gov
- **Richard S. Van Dyke**    rsvandyke@vdalaw.com
- **Alan Vanderhoff**    alan.vanderhoff@vanderhofflaw.com, alanvanderhoff@cox.net
- **Victor A. Vilaplana**    vavilaplana@foley.com

and on the parties listed below by the following means of service:

**Debtor:**
**Briarwood Capital, LLC**
**PO Box 1159**
**Rancho Santa Fe, CA 92067**

**Special Notice:**
**Daniel Petrocelli, Esq.**
**David Marroso, Esq.**
**O'MELVENY & MYERS LLP**
**1999 Avenue of the Stars, 7th Floor**
**Los Angeles, CA 90067**
*Counsel for Lennar Corporation and Lennar*
*Homes of California, Inc.*

**Special Notice:**
**Michelle B. Baker, Esq.**
**Jeffrey J. Mann, Esq.**
**B|R LAW GROUP, LLP**
**4370 La Jolla Village Drive, Suite 670**
**San Diego, CA 92122**
*Counsel for Barry Minkow and Fraud Discovery*
*Institute, Inc.*

___✓___ (U.S. MAIL): I placed a true copy of the above-mentioned document(s) in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit.

_____ (OVERNIGHT MAIL): I placed a true copy of the above mentioned document(s) in a sealed overnight envelope or package with delivery fees paid or provided for, addressed to the person(s) as indicated above, on the above-mentioned date, and I deposited same in a box or other facility regularly maintained by that overnight delivery service or delivered same to an authorized courier or driver authorized by the overnight delivery service to receive documents.

_____ (FACSIMILE): I caused the above-mentioned document(s) to be transmitted by facsimile machine to the parties and numbers indicated above, on the above-mentioned date, pursuant to Rule 2.306. The facsimile machine I used complied with Rule 2.306 and no error was reported by the machine. Pursuant to Rule 2.306, I caused the machine to print a transmission record of the transmission, a copy of which is maintained by this office.

_____ (PERSONAL SERVICE): I provided a true copy of the above-mentioned document(s) to a messenger for personal delivery to each person named above, at the address(es) shown above, before 5:00 p.m. on the above-mentioned date.

_____ (ELECTRONIC MAIL): I caused the above-mentioned document(s) to be transmitted electronically to the e-mail address of the addressees indicated above. I am readily familiar with this firm's Microsoft Outlook electronic mail system and each such document was duly served electronically on the above-mentioned date, and the transmission was reported as complete and without error.

I am employed in the office of Jared M. Toffer, a member of the bar of this Court, and the foregoing document(s) was/were printed on recycled paper. I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on **May 3, 2011**.

_____
*/s/ Wendy S. Mills*
Wendy S. Mills

23